**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

**JULY 21, 2005**

**PEOPLE OF THE STATE OF MICHIGAN,**

**Plaintiff-Appellant,**

**v**                                             **No. 125375**

**MARLON BELL,**

**Defendant-Appellee.**

_____

**BEFORE THE ENTIRE BENCH**

**CORRIGAN, J.**

In this case, we consider whether the trial court failed to follow the three-step process of *Batson v Kentucky,* 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), when it prohibited defendant from exercising his right to two peremptory challenges and, if so, whether that error is structural and, thus, requires automatic reversal. In *Batson,* the United States Supreme Court held that a peremptory challenge to strike a juror may not be exercised on the basis of race. *Id.* at 89, 96-98. The Court set forth a three-step process for determining whether a challenger has improperly exercised peremptory challenges. First, the

opponent of the challenge must make a prima facie showing of discrimination based on race.  *Id.* at 94-97.  Next, once the prima facie showing is made, the burden then shifts to the challenging party to come forward with a neutral explanation for the challenge.  *Id.* at 97.  Finally, the trial court must decide whether the opponent of the challenge has proven purposeful discrimination.  *Id.* at 100.

In this case, a prima facie showing was made that two of defendant's peremptory challenges were based on race. The trial court initially erred in failing to allow defendant to provide race-neutral reasons for the challenges.  The trial court subsequently cured this error by allowing defendant to provide reasons for the challenges.  Defendant's reasons were race-conscious rather than race-neutral. Accordingly, the trial court disallowed the challenges.  Because the trial court's initial error was subsequently cured and because defendant's reasons were race-conscious, we conclude that the trial court did not fail to follow the three-step *Batson* procedure and did not err in disallowing the challenges in question.  We further conclude that the trial judge's initial error does not require automatic reversal.  We thus reverse the judgment of the Court of Appeals.

## I. UNDERLYING FACTS AND PROCEDURAL HISTORY

On July 29, 1999, defendant robbed and shot Chanel Roberts and Amanda Hodges, killing both victims. Following a jury trial, defendant was convicted of two counts of first-degree felony murder, MCL 750.316; two counts of armed robbery, MCL 750.529; and one count of conspiracy to commit armed robbery, MCL 750.529 and MCL 750.157a. Defendant was sentenced to concurrent terms of mandatory life imprisonment without parole for the first-degree felony murder convictions and life imprisonment for the armed robbery and conspiracy to commit armed robbery convictions.

Defendant is African-American and the two victims were Caucasian. During jury selection, defense counsel attempted to exercise a peremptory challenge to strike potential juror number ten, who is Caucasian. Juror ten stated during voir dire that three of his friends were high-ranking police officers, but that he "wouldn't think" that this fact would affect his ability to be fair and impartial. When defense counsel attempted to excuse this juror peremptorily, the trial court disallowed the challenge, concluding that counsel had exercised the challenge on the basis of race. The trial court initially refused to allow defense counsel to make a record, but

3

reconsidered after defense counsel expressed dissatisfaction with the trial court's refusal. Defense counsel then furnished a race-conscious, rather than race-neutral, reason for the challenge and the trial court continued to disallow the challenge.

Jury selection continued. After several more defense peremptory challenges, the prosecutor objected when defense counsel attempted to excuse juror number five. The prosecutor claimed that defense counsel was attempting to strike juror five on the basis of race, contrary to *Batson*. The trial court excused the jury in order to make a record regarding the challenge. The prosecutor noted that the current challenge was defense counsel's third consecutive strike on a Caucasian male and that defense counsel was attempting to exclude Caucasian males from the jury. Defense counsel replied that the prosecution's argument would have some merit if no other Caucasian males remained on the jury. Defense counsel also noted that the majority of the remaining jurors was Caucasian. Defense counsel offered no other explanation for his challenge. The trial court found defense counsel's explanation race-conscious and disallowed the challenge. Consequently, both jurors five and ten sat on the jury that convicted defendant.

4

On appeal, defendant raised several claims of error, including the claim that the trial court failed to follow the three-step procedure mandated in *Batson* in disallowing his peremptory challenges of jurors five and ten. The Court of Appeals, in a split decision, agreed that the trial court failed to follow the *Batson* procedure, but, nevertheless, upheld defendant's convictions.[1] Judges Zahra and Wilder concluded that the trial court's *Batson* error was not of constitutional dimension and was subject to harmless error analysis, while Judge Fitzgerald would have held that the error was structural and required automatic reversal.

Defendant sought reconsideration. The Court of Appeals granted defendant's motion and vacated its prior opinion.[2] On reconsideration, the Court held that a denial of the statutory right to a peremptory challenge is error per se.[3] Judges Zahra and Wilder concurred, stating that they were "duty-bound" to follow the holdings in *People v Miller,* 411

_____

[1] Unpublished opinion per curiam, issued October 2, 2003 (Docket No. 233234).

[2] Unpublished order of the Court of Appeals, entered October 30, 2003 (Docket No. 233234).

[3] (*On Reconsideration*), 259 Mich App 583; 675 NW2d 894 (2003).

5

Mich 321; 307 NW2d 335 (1981), and *People v Schmitz,* 231 Mich App 521; 586 NW2d 766 (1998).

The prosecutor applied for leave to appeal, contending that the alleged denial of defendant's statutory right to remove prospective jurors peremptorily was not error requiring automatic reversal.

We granted the prosecution's application for leave to appeal.[4] The prosecution contends that the trial court did not err in failing to follow the procedures set forth in *Batson.* Alternatively, the prosecution argues that even if the trial court erred in failing to follow the *Batson* procedures, the error was harmless.

Defendant argues that the trial court denied him his right to exercise two peremptory challenges by arbitrarily disallowing the challenges without following the mandated *Batson* procedures. Defendant further argues that the denial of this right requires automatic reversal.

## II. STANDARD OF REVIEW

This case requires us to determine whether the trial court failed to follow the procedures set forth in *Batson* in disallowing two of defendant's peremptory challenges. We review de novo issues regarding a trial court's proper

---

[4] 470 Mich 870 (2004).

6

application of the law. *People v Goldston,* 470 Mich 523, 528; 682 NW2d 479 (2004). We review for clear error a trial court's decision on the ultimate question of discriminatory intent under *Batson*. *Hernandez v New York*, 500 US 352, 364-365; 111 S Ct 1859; 114 L Ed 2d 395 (1991); *United States v Hill*, 146 F3d 337, 341 (CA 6, 1998).

### III. ANALYSIS

### A. *Batson* Rule

In *Batson,* the United States Supreme Court made it clear that a peremptory challenge to strike a juror may not be exercised on the basis of race. *Batson, supra* at 89, 96-98. The prosecution in *Batson* attempted to exclude African-American jurors solely on the basis of their race. *Id.* at 82-83. The Court determined that the prosecution's actions violated the Equal Protection Clause. It set forth a three-step process for determining an improper exercise of peremptory challenges. First, there must be a prima facie showing of discrimination based on race. *Id.* at 94-97. To establish a prima facie case of discrimination based on race, the opponent of the challenge must show that: (1) the defendant is a member of a cognizable racial group; (2) peremptory challenges are being exercised to exclude members of a certain racial group from the jury pool; and (3) the circumstances raise an inference that the exclusion

7

was based on race. *Id.* at 96. The *Batson* Court directed trial courts to consider all relevant circumstances in deciding whether a prima facie showing has been made. *Id.*

Once the opponent of the challenge makes a prima facie showing, the burden shifts to the challenging party to come forward with a neutral explanation for the challenge. *Id.* at 97. The neutral explanation must be related to the particular case being tried and must provide more than a general assertion in order to rebut the prima facie showing. *Id.* at 97-98. If the challenging party fails to come forward with a neutral explanation, the challenge will be denied. *Id.* at 100.

Finally, the trial court must decide whether the nonchallenging party has carried the burden of establishing purposeful discrimination. *Id.* at 98. Since *Batson*, the Supreme Court has commented that the establishment of purposeful discrimination "comes down to whether the trial court finds the . . . race-neutral explanations to be credible." *Miller-El v Cockrell*, 537 US 322, 339; 123 S Ct 1029; 154 L Ed 2d 931 (2003). The Court further stated, "Credibility can be measured by, among other factors, the . . . [challenger's] demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial

8

strategy." *Id*. at 339. If the trial court finds that the reasons proffered were a pretext, the peremptory challenge will be denied. *Batson, supra* at 100.

B. Application of *Batson* to the Facts in this Case

In Michigan, the right to exercise a peremptory challenge is provided by court rule and statute. According to MCR 6.412(E)(1), a defendant is entitled to five peremptory challenges unless an offense charged is punishable by life imprisonment, in which case a defendant being tried alone is entitled to twelve peremptory challenges. Further, under MCL 768.13, "[a]ny person who is put on trial for an offense punishable by death or imprisonment for life, shall be allowed to challenge peremptorily twenty of the persons drawn to serve as jurors, and no more . . . ."[5]

The trial court followed the court rule, which entitled defendant to twelve peremptory challenges because he was on trial for an offense punishable by life imprisonment. Defendant claims that the trial court violated his right to two of the peremptory challenges by

---

[5] MCR 6.412(E) departs from the statute by reducing the number of peremptory challenges to which a defendant is entitled. We need not resolve the discrepancy between the statute and the court rule because this issue is not before us.

failing to follow the three-step procedure mandated in *Batson* in disallowing the challenges.

Applying the above rules to the facts in this case, we conclude that no such error occurred.[6]

1. Prima Facie Showing of Discrimination Based on Race

Here, defense counsel had already exercised several peremptory challenges and was attempting to challenge juror ten when the trial court interrupted and requested that counsel for both parties proceed to chambers. While in chambers, the trial court stated that it was going to disallow the challenge because defense counsel had based his challenges on the race of the juror. The trial court reached this conclusion because defense counsel had established a pattern of excusing Caucasian males.[7]

After defense counsel's peremptory challenge of juror five, the prosecution objected, reasoning that juror five

---

[6] In *Georgia v McCollum*, 505 US 42, 59; 112 S Ct 2348; 120 L Ed 2d 33 (1992), on remand 262 Ga 554; 422 SE2d 866 (1992), the United States Supreme Court extended the *Batson* rule to govern the conduct of criminal defendants ("the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges").

[7] The challenge to juror ten was defense counsel's ninth challenge. Of the nine challenges, defense counsel exercised seven against Caucasian males and two against females whose race could not be determined from the record.

was Caucasian and the two previous challenges by defense counsel were of Caucasian males.  The trial court agreed and disallowed the challenge.

On appeal, defendant argued that the trial court erred by raising *Batson* sua sponte to question defense counsel's reasons for peremptorily challenging juror number ten. Defendant further maintained that neither the trial court nor the prosecution established a prima facie showing of discrimination based on race for either challenge.

The Court of Appeals held that a trial court may raise a *Batson* issue sua sponte, noting that virtually all state courts have concluded that a trial court may raise a *Batson* issue sua sponte.  The Court of Appeals, however, concluded that because the record did not reveal the racial identities of the prospective jurors, it could not determine whether a prima facie case of discrimination had been established.

We have not previously addressed the question whether a trial court may raise a *Batson* issue sua sponte. The rationale underlying *Batson* and its progeny, however, supports the Court of Appeals position that the trial court may make an inquiry sua sponte after observing a prima facie case of purposeful discrimination through the use of

11

peremptory challenges.  *Batson* and its progeny[8] make clear that a trial court has the authority to raise sua sponte such an issue to ensure the equal protection rights of individual jurors.  See *Batson, supra* at 99 ("In view of the heterogeneous population of our Nation, public respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race."); *Georgia v McCollum,* 505 US 42, 49-50; 112 S Ct 2348; 120 L Ed 2d 33 (1992), quoting *State v Alvarado*, 221 NJ Super 324, 328; 534 A2d 440 (1987) ("'Be it at the hands of the State or the defense,' if a court allows jurors to be excluded because of group bias, '[it] is [a] willing participant in a scheme that could only undermine the very foundation of our system of justice--our citizens' confidence in it.'").

The United States Supreme Court, in *Powers v Ohio*, 499 US 400, 416; 111 S Ct 1364; 113 L Ed 2d 411 (1991), held

---

[8] The Court of Appeals correctly noted that the following cases have held that a trial court may raise a *Batson* issue sua sponte to protect the rights secured by the Equal Protection Clause: *State v Evans*, 100 Wash App 757, 765-767; 998 P2d 373 (2000); *Commonwealth v Carson*, 559 Pa 460, 476-479; 741 A2d 686 (1999); *Brogden v State*, 102 Md App 423, 430-432; 649 A2d 1196 (1994); *Lemley v State*, 599 So 2d 64, 69 (Ala App, 1992).

that a criminal defendant has standing to object to a prosecutor's peremptory challenges. It reasoned:

> The barriers to a suit by an excluded juror are daunting. Potential jurors are not parties to the jury selection process and have no opportunity to be heard at the time of their exclusion. Nor can excluded jurors easily obtain declaratory or injunctive relief when discrimination occurs through an individual prosecutor's exercise of peremptory challenges. Unlike a challenge to systematic practices of the jury clerk and commissioners such as we considered in *Carter* [*v Jury Comm of Greene Co,* 396 US 320; 90 S Ct 518; 24 L Ed 2d 549 (1970)], it would be difficult for an individual juror to show a likelihood that discrimination against him at the *voir dire* stage will recur. And, there exist considerable practical barriers to suit by the excluded juror because of the small financial stake involved and the economic burdens of litigation. The reality is that a juror dismissed because of race probably will leave the courtroom possessing little incentive to set in motion the arduous process needed to vindicate his own rights. [*Id.* at 414-415 (citations omitted).]

The *Powers* Court further stated:

> The statutory prohibition on discrimination in the selection of jurors, enacted pursuant to the Fourteenth Amendment's Enabling Clause, makes race neutrality in jury selection a visible, and inevitable, measure of the judicial system's own commitment to the commands of the Constitution. The courts are under an affirmative duty to enforce the strong statutory and constitutional policies embodied in that prohibition. [*Id.* at 416 (citation omitted).]

The Supreme Court's rationale for allowing a defendant to raise a *Batson* issue supports our conclusion that a

13

trial court may sua sponte raise a *Batson* issue. Trial courts are in the best position to enforce the statutory and constitutional policies prohibiting racial discrimination. Further, wrongly excluded jurors have little incentive to vindicate their own rights. We thus conclude, for the foregoing reasons, that a trial court may sua sponte raise a *Batson* issue.

We reject the Court of Appeals assertion that it could not establish whether a prima facie case of discrimination had been made regarding the challenges because of the inadequacy of the record. It is undisputed that defendant is an African-American male. While the challenged jurors were not of defendant's racial group, it is equally harmful to challenge only members outside a defendant's racial group. *Powers, supra* at 415-416. The trial court specifically stated that it was disallowing the challenges because defense counsel, for the better part of the day, had only excused Caucasian male jurors.[9] Defense counsel did not dispute that he had only excused Caucasian males.

---

[9] We recognize that the trial court's statement is not entirely accurate because defense counsel peremptorily challenged two females. We conclude, however, that this fact does not diminish defense counsel's pattern of peremptorily challenging Caucasian males.

Instead, he pointed to the racial make-up of the remaining jurors to justify his challenges.

The trial court rejected defense counsel's challenge of juror ten because defense counsel had exercised seven of nine peremptory challenges against Caucasian males. The prosecution objected to defense counsel's challenge of juror five because defense counsel consecutively excused three Caucasian male jurors. In both instances, defense counsel's challenges created a pattern of strikes against Caucasian males. This pattern was sufficient to raise an inference that defense counsel was indeed excluding potential jurors on the basis of their race. See *Batson, supra* at 97 (a pattern of strikes against jurors of a specific race may give rise to an inference of discrimination). We thus conclude that the Court of Appeals erred in failing to find a prima facie showing of discrimination based on race.

### 2. Neutral Explanation for the Challenge

Once a prima facie showing is made, the burden shifts to the challenger to provide a neutral explanation for the challenge. Upon the trial court's finding that defense counsel's challenge of juror ten was based on race, defense counsel requested an opportunity to make a record. The trial court initially denied defense counsel's request, but

reconsidered upon defense counsel's objection. Defense counsel stated:

> I would bring to the Court's attention that the number of white males on that panel still exceeds the number of the minorities on that panel. Why don't you talk about the whole racial composition of that panel? There's still a vast majority of white members on that panel than it is [sic] black members on that panel.

The trial court responded by stating that defense counsel's reason supported its prima facie finding that counsel had exercised the challenge on the basis of race and upheld its disallowance of the challenge.

After the prosecutor objected to defense counsel's peremptory challenge of juror five, the trial court disallowed the challenge "for the same reasons as asserted before." Defense counsel objected and attempted to make a record, but the trial court interrupted him. The trial court then allowed defense counsel to make a record, but only after the prosecutor asked to approach the bench. The prosecutor stated that defense counsel's three previous peremptory challenges, including juror five, were of Caucasian males. Defense counsel responded by giving race-neutral reasons for two of the challenges. The trial court noted that it was only concerned with defense counsel's reasons for challenging juror five. Defense counsel replied:

Judge, again, if there were no other white males on that jury, or white males were a minority on that jury, then there may be some persuasive force to [the assistant prosecutor's] argument about a *Battson* [sic] challenge.

That simply is not the case. The demographics of that jury do not hold up to that kind of a challenge.

And I think I don't have to have a reason for exercising a peremptory challenge.

Defense counsel gave no other reason for his challenge. The trial court stated that peremptory challenges could not be based on race and found that defense counsel's peremptory challenge of juror five had been based on gender and race.

The Court of Appeals concluded that even if a prima facie case had been established, the trial court failed to comply with steps two and three of the *Batson* process. It found that the trial court erred by denying defense counsel the opportunity to make a record before disallowing the peremptory challenge of juror ten. It further found that the trial court failed to inquire whether defense counsel had a race-neutral reason for striking juror five.

We agree that the trial court initially erred in denying defense counsel the opportunity to provide race-neutral reasons for his challenges. We conclude, however, that these errors were cured when the trial court, almost

17

immediately after each challenge, permitted defense counsel to make a record. It then based its ultimate conclusion to disallow the challenges on defendant's race-conscious reasons. Because the trial court did perform the steps required by *Batson*, albeit somewhat belatedly, it did not improperly deny defendant the right to exercise two of his statutorily prescribed peremptory challenges.

We reject the claim that the trial court failed to inquire whether defense counsel had a race-neutral reason for striking juror five because the record shows otherwise. Defense counsel provided only one reason for his challenges, which was not race-neutral and did not refute the prima facie showing that his challenges were based on race. Just as a challenger may not exclude a prospective juror on the basis of race, it is equally improper for a challenger to engineer the composition of a jury to reflect the race of the defendant.

Finally, defendant claims on appeal that his responses were not given as race-neutral reasons for his challenges, but, rather, as attempts to disprove the trial court's and the prosecution's prima facie showings of racial discrimination. We are not persuaded by this argument. Defense counsel never contended that the trial court and the prosecution had not made a prima facie case of racial

18

discrimination.  If he was merely attempting to disprove the prima facie showings, defense counsel would not have stopped there, but would have also provided race-neutral reasons for the challenges in the event that the trial court refused to accept his argument.  Additionally, the record indicates that defense counsel understood that he was to provide race-neutral reasons.  The prosecution objected to the challenge of juror five because defense counsel's three previous peremptory challenges, including juror five, were of Caucasian males.  Defense counsel then furnished race-neutral reasons for two of the challenges. But with respect to juror five, defense counsel merely stated that the prosecution's argument failed because Caucasian males still remained on the jury.  Defendant clearly demonstrated his understanding and ability to provide race-neutral reasons when needed. In juror five's case, he failed to do so.[10]  While defense counsel may not

---

[10] Defense counsel's failure to provide race-neutral reasons for his challenges, especially after demonstrating his ability to do so, provide additional support for the inference of discrimination.  See *Johnson v California*,___ US ___; 125 S Ct 2410; 162 L Ed 2d 129 (2005), in which the United States Supreme Court stated:

> In the unlikely hypothetical in which the prosecutor declines to respond to a trial judge's inquiry regarding his justification for making a

Footnotes continued on following page.

have effectively used his opportunity to provide race-neutral reasons for his challenges, he had the opportunity. Defendant cannot complain now that the opportunity was insufficient.

### 3. Trial Court's Decision Regarding Purposeful Discrimination

Finally, the trial court must determine whether the opponent of the challenge has carried the burden of establishing purposeful discrimination. This decision may

> strike, the evidence before the judge would consist not only of the original facts from which the prima facie case was established, but also the prosecutor's refusal to justify his strike in light of the court's request. Such a refusal would provide additional support for the inference of discrimination raised by a defendant's prima facie case. [*Id.*, ___ US ___ n 6; 125 S Ct ___ n 6; 162 L Ed 2d 140 n 6.]

> Justice Kelly claims that defendant did not provide race-neutral reasons for his challenges because he was never asked for his reasons. The trial transcript, however, indicates that defendant did provide reasons, which the trial court found to be race-conscious. After the prosecutor's objection to the exclusion of prospective juror five, defense counsel volunteered race-neutral reasons for excluding the two prospective jurors preceding prospective juror five. The trial court then stated, "That's not an issue. The issue is the last juror." Defense counsel responded, "Judge, again, if there were no other white males on the jury, or white males were a minority on that jury, then there may be some persuasive force to [the prosecutor's] argument about a Battson [sic] challenge." The trial court then indicated, "[b]ut you cannot use a racial basis or a gender basis for excusing jurors." Defense counsel responded, "And I've given my reasons on the record, and . . . none of them were related to race or gender."

20

hinge on the credibility of the challenger's race-neutral explanations, but only if the challenger provided race-neutral explanations. Here, defense counsel provided race-conscious, rather than race-neutral, reasons for his challenges. This reinforces the prima facie showings that the challenges were based on race. Consequently, the trial court did not clearly err in finding purposeful discrimination.

### IV.  STANDARD OF REVIEW FOR DENIALS OF PEREMPTORY CHALLENGES

In light of our conclusion that the trial court's initial error was cured, we need not address whether a denial of a peremptory challenge is subject to automatic reversal. Had we concluded, however, as do our dissenting colleagues, that defendant's peremptory challenges had been improperly denied, we would have applied a harmless error standard to the error, because *People v Miller*, 411 Mich 321; 307 NW2d 335 (1981), and *People v Schmitz*, 231 Mich App 521; 586 NW2d 766 (1998), are no longer binding, in light of our current harmless error jurisprudence, to the extent that they hold that a violation of the right to a peremptory challenge requires automatic reversal.

We arrive at this conclusion by recognizing the distinction between a *Batson* error and a denial of a peremptory challenge. A *Batson* error occurs when a juror

21

is actually dismissed on the basis of race or gender.[11]  It is undisputed that this type of error is of constitutional dimension and is subject to automatic reversal.[12]  In contrast, a denial of a peremptory challenge on other grounds amounts to the denial of a statutory or court-rule-based right to exclude a certain number of jurors.  An improper denial of such a peremptory challenge is not of constitutional dimension.[13]

In *Miller*, this Court held that "a defendant is entitled to have the jury selected as provided by the rule.  Where, as here, a selection procedure is challenged before the process begins, the failure to follow the procedure prescribed in the rule requires reversal.[14]  In *Schmitz*, the Court of Appeals relied on *Miller* to hold that a denial of

---

[11] *Batson, supra.*

[12] See  *Johnson v United States*, 520 US 461, 468-469; 117 S Ct 1544; 137 L Ed 2d 718 (1997); *J E B v Alabama ex rel T B*, 511 US 127, 142 n 13; 114 S Ct 1419; 128 L Ed 2d 89 (1994).

[13] *United States v Martinez-Salazar,* 528 US 304, 311; 120 S Ct 774; 145 L Ed 2d 792 (2000); *Ross v Oklahoma,* 487 US 81, 88; 108 S Ct 2273; 101 L Ed 2d 80 (1988)(the United States Supreme Court recognized that peremptory challenges are not of constitutional dimension and are merely a means to achieve the end of an impartial jury).

[14] *Miller, supra* at 326.

a peremptory challenge requires automatic reversal.[15] Following *Miller* and *Schmitz*, however, our harmless error jurisprudence has evolved a great deal, as has that of the United States Supreme Court. See *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999).[16] Under *Carines*, a nonconstitutional error does not require automatic reversal. *Id.* Rather, if the error is preserved, it is subject to reversal only for a miscarriage of justice under the *Lukity*[17] "more probable than not" standard. *Id.* See

---

[15] *Schmitz, supra* at 530-532.

[16] See, also, *Martinez-Salazar, supra* at 317 n 4, in which the Supreme Court recognized that the rule of automatic reversal for an erroneous denial of peremptory challenges makes little sense in light of its recent harmless error jurisprudence. It stated:

> Relying on language in *Swain v Alabama* . . . Martinez-Salazar urges the Court to adopt a remedy of automatic reversal whenever a defendant's right to a certain number of peremptory challenges is substantially impaired. . . . Because we find no impairment, we do not decide in this case what the appropriate remedy for a substantial impairment would be. We note, however, that the oft-quoted language in *Swain* was not only unnecessary to the decision in that case—because *Swain* did not address any claim that a defendant had been denied a peremptory challenge—but was founded on a series of our early cases decided long before the adoption of harmless-error review.

[17] *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999).

23

also MCL 769.26. If the error is forfeited, it may be reviewed only for plain error affecting substantial rights. *Carines*, *supra.*

Because the right to a peremptory challenge in Michigan is not provided by the Michigan Constitution but, rather, by statute and court rule, we conclude, as did the United States Supreme Court, that the right is of non-constitutional dimension.[18] Thus, under our jurisprudence,

---

[18] Although courts in other jurisdictions have reached contrary conclusions, we believe their analyses are unpersuasive. In *United States v McFerron*, for example, the Sixth Circuit Court of Appeals held that the erroneous denial of a peremptory challenge is a structural error. 163 F3d 952, 956 (CA 6, 1998). But *McFerron* predated *Martinez-Salazar* and is therefore of questionable weight.

The Washington Supreme Court also held that the denial of a peremptory challenge in a so-called "reverse-*Batson*" context is structural error. *State v Vreen*, 143 Wash 2d 923; 26 P3d 236 (2001). While *Vreen* acknowledges *Martinez-Salazar,* the court dismisses that case with a cursory and, in our view, unpersuasive analysis. Indeed, all the cases cited by the *Vreen* court for its assertion that "the vast majority [of courts] have found harmless error doctrine simply inappropriate in such circumstances" predate *Martinez-Salazar*. See *id.* at 929.

We agree with the Court of Appeals for the Seventh Circuit that *Martinez-Salazar* marked a significant shift in the standard of review applicable to the erroneous denial of a peremptory challenge. *United States v Harbin,* 250 F3d 532, 546 (CA 7, 2001), citing *United States v Patterson,* 215 F3d 776 (CA 7, 2000), vacated in part by *Patterson v United States,* 531 US 1033 (2000). In *Harbin*, the Seventh Circuit noted that it had been "[f]reed from the *Swain* language by the Court's footnote in *Martinez-Salazar*
Footnotes continued on following page.

24

a violation of the right is reviewed for a miscarriage of justice if the error is preserved and for plain error affecting substantial rights if the error is forfeited.[19]

## V. RESPONSE TO THE DISSENT

Justice Kelly's dissent asserts that the trial court's failure to follow the three-step *Batson* procedures was

. . . ." *Harbin, supra* at 546 (holding, however, that the prosecution's mid-trial use of a peremptory challenge was a structural error). *United States v Jackson,* 2001 US Dist LEXIS 4900, *7 n 1 (SD Ind, 2001) ("The bottom line is that [the] discussion of the need for a clear understanding of the peremptory challenge [in *United States v Underwood,* 122 F3d 389, 392 (CA 7, 1997)] process remains good law, but the automatic reversal standard is no longer applicable.")

Given the standard of harmless error review that now prevails in both the United States Supreme Court and this Court, we believe that the erroneous denial of a peremptory challenge is not subject to automatic reversal.

[19] Justice Kelly inaccurately states that we are departing from the trend set by most other courts that have considered harmless error application to denials of peremptory challenges. We do not depart from that trend, however, because the trend leans toward application of harmless error analysis to improper denials of peremptory challenges.

Justice Kelly further states that we rely on *Martinez-Salazar* to support our alleged departure. We, however, rely on current Michigan harmless error jurisprudence to support our conclusion that an improper denial of a peremptory challenge is subject to harmless error analysis. We discuss *Martinez-Salazar* to merely show that the United States Supreme Court's harmless error jurisprudence is evolving, which strongly indicates that in the federal system nonconstitutional errors, such as an improper denial of peremptory challenges, would be subject to harmless error analysis.

25

incurable and requires automatic reversal. She states that the trial court failed to complete a single step of the three-step *Batson* procedures and collapsed all three steps into one. In reaching this conclusion, Justice Kelly states that the trial court failed to scrutinize carefully whether a prima facie case had been made.

Even if the trial court's prima facie findings were inadequate, that inadequacy would not be outcome determinative because defendant subsequently offered an explanation for his challenges. Further, the trial court ruled on the ultimate question of intentional discrimination. See *Hernandez v New York*, 500 US 352, 359; 111 S Ct 1859; 114 L Ed 2d 395 (1991) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."); see also *Saiz v Ortiz*, 392 F3d 1166, 1179 n 8 (CA 10, 2004) (the existence or absence of a prima facie case is moot where the trial court refused to make a finding regarding whether a prima facie case had been established, but proceeded to hear the prosecution's explanation for the challenge). Justice Kelly states that our reliance on *Hernandez* is misplaced. She notes that

26

*Hernandez* observes that a defendant may concede the first *Batson* step by moving to the second step. We agree and suggest that is exactly what occurred in this case. Both the trial court and the prosecutor objected to defense counsel's use of peremptory challenges, claiming that he was using them to exclude African-American veniremembers. While the trial court did not initially allow defense counsel to provide race-neutral reasons for his challenges, it almost immediately recanted its refusal and allowed defense counsel to provide reasons, which were race-conscious. The trial court ultimately denied defense counsel's challenges, finding that defense counsel's race-conscious reasons supported the initial allegations that he had been excluding veniremembers on the basis of race. The trial court's initial refusal to allow defense counsel to provide race-neutral reasons for his challenges does not amount to a collapsing of the *Batson* steps. Rather, if anything, it amounted to imperfect compliance with the *Batson* procedures. The trial court, however, ultimately conducted each *Batson* step and made a ruling on the basis of defense counsel's race-conscious reasons. Thus, any error that may have occurred in the trial court's *Batson* application was subsequently cured.

Justice Kelly incorrectly assumes that strict adherence to the *Batson* procedures is constitutionally mandated. To the contrary, the purpose of the *Batson* test is to ensure adherence to the "principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v Elem*, 514 US 765, 768; 115 S Ct 1769; 131 L Ed 2d 834 (1995).[20] Our research reflects that trial courts have failed to comply perfectly with *Batson* in the past. See *United States v Castorena-Jaime*, 285 F3d 916, 929 (CA 10, 2002) ("Notwithstanding the district court's failure to make express findings on the record [regarding the *Batson* steps] in the present case, the district court's ultimate conclusion on discriminatory intent was not clearly erroneous."); *Saiz, supra* (the United States Court of

---

[20] See, also, *Johnson, supra*, ___ US ___ n 7; 125 S Ct ___ n 7; 162 L Ed 2d 140 n 7, in which the United States Supreme Court compared the *Batson* burden-shifting framework to the framework set forth in *McDonnell Douglas Corp* v *Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973). The *Johnson* Court cited *St Mary's Honor Ctr v Hicks*, 509 US 502; 113 S Ct 2742; 125 L Ed 2d 407 (1993), for the proposition that the "burden-shifting framework [set forth in *Batson* and *McDonnell Douglas*] triggered by a defendant's prima face case is essentially just 'a means of "arranging the presentation of evidence."'" *Johnson, supra*, ___ US ___ n 7; 125 S Ct ___ n 7; 162 L Ed 2d 140 n 7, quoting *St Mary's, supra*, 509-510, quoting *Watson* v *Fort Worth Bank & Trust*, 487 US 977, 986; 108 S Ct 2777; 101 L Ed 2d 827 (1988).

Appeals inferred from the record that the trial court did not find a prima facie case of discrimination).[21] Their failure to do so, however, is not error as long as trial courts do not shift the burden of persuasion onto the challenger.

Justice Kelly contends that the trial court, by collapsing the three *Batson* steps into one, placed the burden on defense counsel to counter the trial court's finding of purposeful discrimination. The record does not support this contention. Both the trial court and the prosecution made a prima facie showing that defense counsel had excluded jurors on the basis of race. The trial court initially refused to allow defense counsel to provide race-neutral reasons, but almost immediately reconsidered and allowed defense counsel to make a record. Defense counsel gave race-conscious reasons regarding both challenges. Thus, he failed to meet the burden of coming forward with race-neutral explanations. Defense counsel's proffer of race-conscious reasons did not rebut the trial court's and the prosecution's prima facie showings of discrimination. Thus, the trial court neither erred in finding purposeful

---

[21] See, also, *United States v Perez*, 35 F3d 632, 636 (CA 1, 1994).

29

discrimination nor erred in rejecting defense counsel's challenges.

Justice Kelly further asserts that our discussion regarding *Miller* and *Schmitz* is inappropriate. We recognize that *Miller* and *Schmitz* need not be addressed, because we have concluded that the trial court did not err in denying defense counsel's peremptory challenges. We disagree, however, that our discussion regarding *Miller* and *Schmitz* is inappropriate and has no legal value. Rather, such discussion is in direct response to the arguments of the dissent, and without such discussion our response would be incomplete. That a response to a dissent may encompass discussion that is dictum does not render it inappropriate or of no legal value; otherwise, only dissenting opinions would be able to opine upon decisions such as *Miller* and *Schmitz*.[22] As stated above, in light of our current harmless error jurisprudence, *Miller* and *Schmitz* are no longer precedentially binding. We thus disagree with

---

[22] Although the dissent labors hard to avoid referencing *Miller* and *Schmitz*, it is puzzling why it would do this with regard to two decisions that are so obviously helpful to its conclusion, except that to reference these decisions would only make obvious the asymmetry of the dissent's position, namely, that the dissent, but not the majority, should be able to analyze *Miller* and *Schmitz*.

30

Justice Kelly's conclusion that our *Miller* and *Schmitz* discussion is inappropriate.

## VI. CONCLUSION

We hold that the trial court's initial failure to follow the three-step process set forth in *Batson* was subsequently cured. Despite our ultimate conclusion that the trial court complied with the requirements of *Batson*, trial courts are well advised to articulate and thoroughly analyze each of the three steps set forth in *Batson*, see pp 7-9 of this opinion, in determining whether peremptory challenges were improperly exercised. In doing so, trial courts should clearly state the *Batson* step that they are addressing and should articulate their findings regarding that step.[23]

---

[23] Federal courts have encountered similar problems regarding appellate review of a trial court's inadequate *Batson* findings. See *Castorena-Jaime, supra* at 929:

> Although we affirm the district court's ruling, we encourage district courts to make explicit factual findings on the record when ruling on Batson challenges. "Specifically, . . . a district court should state whether it finds the proffered reason for a challenged strike to be facially race neutral or inherently discriminatory and why it chooses to credit or discredit the given explanation." A district court's clearly articulated findings assist our appellate review of the court's Batson ruling, and "ensure[] that the trial court has indeed

Footnotes continued on following page.

31

We further hold that the trial court did not commit clear error in finding as a matter of fact that defense counsel exercised peremptory challenges on the basis of the race of the prospective jurors. Accordingly, we reverse the judgment of the Court of Appeals.

> Maura D. Corrigan
> Robert P. Young, Jr.
> Stephen J. Markman

---

made the crucial credibility determination that is afforded such great respect on appeal." [Quoting *Perez, supra* at 636 (citation omitted).]

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                    No. 125375

MARLON BELL,

    Defendant-Appellee.
_____

WEAVER, J. *(concurring)*.

I concur in the result of the lead opinion and join parts I to III of the opinion. As the lead opinion has explained, the record reflects that any initial error by the trial court was cured when the trial court allowed defendant to provide reasons for the peremptory challenges and that the reasons proffered by defendant for the challenges were race-conscious.

I do not join part IV of the lead opinion, which addresses whether the violation of a right to a peremptory challenge requires automatic reversal, nor do I join the last paragraph of part V, which concludes that it is proper to address the issue because it is in response to the dissent. *Ante* at 21-25, 30-31. In my opinion, such discussion is unnecessary to the opinion and therefore is

dicta.  I would wait until the issue is squarely before us before determining whether the improper denial of a peremptory challenge is subject to structural error analysis.  Therefore, I do not join part IV or the last paragraph of part V.

Elizabeth A. Weaver

**S T A T E   O F   M I C H I G A N**

**SUPREME COURT**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                                           No. 125375

MARLON BELL,

    Defendant-Appellee.

_____

TAYLOR, C.J. (*dissenting in part and concurring in part*).

I respectfully dissent from the lead opinion's conclusion that defense counsel provided race-conscious reasons for the two peremptory challenges the trial court refused to allow him to exercise. Rather, I agree with Justice Kelly's dissent that defense counsel's comments were intended only to challenge the idea that a prima facie showing of discrimination had been made. Thus, defense counsel's comments were legitimate and directed only at *Batson*'s first step. Thereafter the trial court did not follow the *Batson v Kentucky,* 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), requirement that it allow defendant the opportunity to articulate a race-neutral explanation for the challenges. Accordingly, I conclude that the trial

court erroneously deprived defendant of two of his peremptory challenges.

As noted by the lead opinion, peremptory challenges are granted to a defendant by statute and by court rule-not by the United States Constitution or the Michigan Constitution. Denial of the statutory right requires reversal of a conviction only if it resulted in a miscarriage of justice. MCL 769.26. Thus, I concur with the lead opinion that the denial of a statutory peremptory challenge is subject to harmless error review and that *People v Schmitz*, 231 Mich App 521; 586 NW2d 766 (1998), must be repudiated to the extent that it held to the contrary. Applying this standard, I find defendant is not entitled to a new trial. I specifically join footnote 18 of the lead opinion because I am persuaded that foreign cases that have concluded that the denial of a statutory right to a peremptory challenge requires automatic reversal were wrongly decided. An automatic reversal should not be required for the mere violation of a statutory right just because the trial court misperceived defense counsel's

effort to peremptorily strike two prospective jurors as a constitutional *Batson* violation.[1]

To the extent that the error is considered to have violated our court rule, the denial is not grounds for granting a new trial unless refusal to grant a new trial is inconsistent with substantial justice. MCR 2.613(A). Applying this standard, I find defendant is not entitled to a new trial.

I also join the lead opinion in questioning the continuing viability of *People v Miller,* 411 Mich 321; 307 NW2d 335 (1981).

---

[1] I do, however, recognize that if a statutory right is denied in a manner that violates equal protection or due process guarantees that such denial may warrant a new trial. As the United States Supreme Court stated in *Evitts v Lucey*, 469 US 387, 401; 105 S Ct 830; 83 L Ed 2d 821 (1985):

> [A]lthough a State may choose whether it will institute any given welfare program, it must operate whatever programs it does establish subject to the protections of the Due Process Clause. Similarly, a State has great discretion in setting policies governing parole decisions, but it must nonetheless make those decisions in accord with the Due Process Clause. In short, when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution -- and, in particular, in accord with the Due Process Clause. [Citations omitted.]

Because I find that the error here was harmless, under both MCL 769.26 and MCR 2.613(A), I agree with the lead opinion that the Court of Appeals decision must be reversed and defendant's convictions should be reinstated.

Clifford W. Taylor

**S T A T E   O F   M I C H I G A N**

**SUPREME COURT**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                                                      No. 125375

MARLON BELL,

    Defendant-Appellee.

_____

KELLY, J. (*dissenting*).

I dissent from the lead opinion for two reasons. First, the trial judge erred by failing to follow the procedures required by *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986). Despite the lead opinion's contention to the contrary, the *Batson* errors were incurable. Second, the lead opinion's dictum regarding *Miller*[1] is inappropriate, and, as dictum, has no legal effect or precedential value. There is no legal basis to overrule *Miller*.

### I. THE *BATSON* RULE

The United States Supreme Court ruled in *Batson* that, when selecting a jury, a prosecutor may not use a peremptory challenge to remove a juror because of the

_____

[1] *People v Miller*, 411 Mich 321; 307 NW2d 335 (1981).

juror's race. *Batson*, *supra* at 89. The Supreme Court gave trial judges a specific three-step procedure to determine whether a peremptory challenge has an improper racial basis.

First, the objecting party must make a prima facie showing, based on the totality of all relevant circumstances, that the other party discriminated in removing the juror. *Id.* at 93-94. Second, the party exercising the peremptory challenge must give a neutral explanation for the removal, showing that it was not based on race. *Id.* at 94, 97. Third, the trial judge must determine if the objecting party established purposeful discrimination. *Id.* at 98.

Although *Batson* dealt with a prosecutor's exercise of peremptory challenges, the Supreme Court extended the rule in later cases. For example, in *Georgia v McCollum*,[2] it stated that the United States Constitution prohibits a criminal defendant from engaging in purposeful discrimination in the exercise of peremptory challenges.

A. THE PEREMPTORY CHALLENGES

In this case, each party had made several peremptory challenges before defense counsel challenged Juror No. 10.

---

[2] 505 US 42, 59; 112 S Ct 2348; 120 L Ed 2d 33 (1992).

During voir dire, Juror No. 10 stated that he was a close friend of several police officers, including a "chief." He stated that he "wouldn't think" that his friendships would make a difference in his ability to make a fair decision. He also responded, when asked if he would feel obliged to apologize should he vote to acquit defendant, that he "hope[d] not."

When defense counsel peremptorily challenged Juror No. 10, the trial judge disallowed the challenge because, he said, it and previous defense challenges were based on race. Defense counsel asked to comment, but the judge refused him the opportunity. Counsel then boisterously objected to the refusal, stating that it was "garbage." The judge then relented and allowed a statement.

Defense counsel argued that he had not attempted to eliminate Juror No. 10, a Caucasian male, because of his race. He pointed out that the Caucasians on the jury outnumbered and exceeded the minorities on the panel. The judge then allowed the prosecution to respond, refused to hear more from defense counsel, and ruled that Juror No. 10 would remain on the jury.

Jury selection continued, and the attorneys made more peremptory challenges. When Juror No. 5 was called, neither side objected for cause, and the prosecution did

3

not exercise a peremptory challenge. Without asking for defense counsel's input, the judge stated, "We have a jury."

Defense counsel approached the bench and an off-the-record discussion ensued. When the proceeding resumed on the record, defense counsel asked to excuse Juror No. 5. The prosecution objected, stating that it was making a *Batson* objection to the defense's peremptory challenge of Juror No. 5.

Without discussion or input from the parties, the judge disallowed the peremptory challenge for the same reasons he had given regarding Juror No. 10. Again, defense counsel sought to comment on the ruling but was refused. After the prosecution evidenced some discomfort with the lack of a record, the judge allowed counsel to make a record outside the presence of the jury.

The prosecutor then observed that the two jurors excused between Juror No. 10 and Juror No. 5 were both Caucasian males. She also indicated that Juror No. 5 was a Caucasian male. She offered no additional basis for her objection to the peremptory challenge of Juror No. 5.

Defense counsel pointed out that there had been no discriminatory pattern to his challenges. He stated that at least as many white males as minority males remained on

4

the jury.  He insisted that there were valid reasons to remove the intervening jurors who were excused.  One had expressed bias towards police officers.  The other, years before, had resided on the street where the crime was alleged to have occurred, and his home had been broken into.  The juror expressed concern about the influence the break-in would have on his decision in this case.

The judge stated that defense counsel's argument was unpersuasive.  Without making further rulings, he brought back the jury, and the trial continued.

### B.  THE TRIAL COURT'S FAILURE TO FOLLOW THE *BATSON* PROCEDURES

The judge failed to follow the three-step procedure required by *Batson*.  In fact, he failed to complete a single step of the procedure.  He did not make a finding regarding whether there had been a prima facie showing of purposeful discrimination.  Instead, it appears that he lumped all three steps into one and made his ruling without further regard to *Batson*.

Trial judges are not at liberty to disregard the *Batson* procedure.  *Batson* is United States Supreme Court precedent that is binding on state courts.  Moreover, the courts may neither ignore one step nor combine the three steps of *Batson*.  *Purkett v Elem*, 514 US 765, 768; 115 S Ct 1769; 131 L Ed 2d 834 (1995).  Instead, they must carefully

and individually consider each. The *Batson* procedure was designed to carefully balance the free exercise of peremptory challenges and the evils of racial discrimination in the selection of jurors. *Batson*, *supra* at 98-99. It was crafted specifically to enforce the mandate of equal protection as well as to further the ends of justice. *Id*. at 99.

In this case, when the trial judge allowed defense counsel to speak, he erroneously placed the burden on counsel to show that the peremptory challenge should not be disallowed. Although *Batson* provides a burden-shifting procedure, the party objecting to a peremptory challenge, in this case the prosecutor, has the ultimate burden of proving purposeful discrimination. *Purkett, supra* at 768. Improperly shifting the burden "violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id*. Therefore, the trial court erred twice in disallowing the peremptory challenges to Jurors No. 5 and No. 10.

The trial court was required to make a ruling on the first step. The court's failure to arrive at a clear conclusion and articulate its findings amounted to error in and of itself. Only if, and when, a trial court concludes

6

that a prima facie case exists does the burden shift to the party exercising the peremptory challenge. Then the trial court must allow that party to articulate race-neutral reasons for the challenge.

In this case, the trial court glossed over the first step, skipped the second step, and jumped to the third. At the third step, the court impermissibly placed on defendant the burden to rebut presumed racial prejudice. These multiple and repeated errors are patently inconsistent with the established *Batson* precedent. They cannot remain uncorrected.

Those on the lead opinion state that their "research"[3] reflects that trial courts often fail to comply with *Batson*. They appear to believe that, because there is a supposed generalized failure of compliance, the seriousness of the trial court's *Batson* errors here is diminished. But an error often repeated is no less an error. In fact, what we should draw from their research is that we must more scrupulously hold our courts responsible for following *Batson.* The United States Supreme Court has carefully laid

---

[3] The lead opinion makes no mention of what the "research" consisted of, and I have no knowledge of what it might be. I know of no research project on this subject conducted by this Court.

out the steps necessary for determining if a *Batson* error exists. It is for us to see that they are followed.

## C. The Trial Court Did Not Cure the Errors

The lead opinion concludes that the trial court cured its errors by allowing defense counsel to respond to its ruling. Those on the lead opinion attempt to fit the facts of this case into *Batson,* rather than apply *Batson* to the facts. They conclude that defense counsel should have used his opportunity to respond to offer race-neutral reasons for the peremptory challenges. The record does not support this conclusion.

The trial court never articulated that a prima facie case of discrimination had been made. Therefore, when it allowed defense counsel to speak, counsel dwelt on the first *Batson* element. He denied the existence of a discriminatory pattern in his peremptory challenges. It appears that he was encouraging the court to refocus and follow the *Batson* procedure. Given that the court had not completed the first step of *Batson*, it was wholly reasonable for defense counsel to direct his comments to that step. And he did just that.

The lead opinion concludes that defense counsel should have surmised that the judge was ignoring *Batson* and

8

tailored his answers accordingly.[4]  This unfairly holds defendant responsible for alleviating the court's error. Trial courts have a clear map to follow in *Batson* cases. Given the magnitude of the error when they fail in that endeavor, it is imperative that we hold courts responsible for correctly applying the *Batson* test.  *Batson*, *supra* at 99; *Purkett*, *supra* at 768.

The lead opinion concludes that defense counsel should have supplied a race-neutral reason for the challenges. However, a good reason exists why he did not respond.  The court never asked for a response and never gave counsel an opportunity to offer one.  Instead, after concluding discussion on what should have been the first step of *Batson*, the judge stopped counsel and overruled his challenges.  This was clearly erroneous.  The judge was required to ask specifically for race-neutral responses

---

[4] The lead opinion also quotes *Johnson v California,* 545 US __; 125 S Ct 2410; 162 L Ed 2d 129 (2005), to contend that defendant's failure to give race-neutral reasons should show support for an inference of discrimination.  But defendant did not refuse to provide race-neutral reasons for his challenge.  He was *never asked* for his reasons.  Therefore, there was no refusal to answer and the quoted material from *Johnson* is inapplicable to this case.  *Id.*, 545 US ___ n 6; 125 S Ct 2418 n 6; 162 L Ed 2d 140 n 6.

pursuant to the second *Batson* step. *Batson*, *supra* at 94, 97.

Instead of that, the judge combined all the *Batson* steps into one and placed the burden on defendant to counter his erroneous ruling. It is impermissible to shift the burden in this manner. *Purkett, supra* at 768. Given that shifting the burden is error in itself, it cannot constitute a cure for the judge's other errors as the lead opinion concludes.

The lead opinion states, "Even if the trial court's prima facie findings were inadequate, that inadequacy would not be outcome determinative because defendant subsequently offered an explanation for his challenges." *Ante* at 26. As noted above, this simply did not happen. Defense counsel's comments were directed to the first *Batson* step. Being that a prima facie case was never established, the burden never shifted to defendant, and he was not required to offer race-neutral reasons. Hence, the court's failure must have been outcome determinative.

The lead opinion attempts to support its position by quoting *Hernandez v New York*, 500 US 352, 359; 111 S Ct 1859; 114 L Ed 2d 395 (1991). But this reliance is misplaced. First, the quotation is drawn from a plurality opinion that, under the doctrine of stare decisis, is not

binding.  *Negri v Slotkin*, 397 Mich 105, 109; 244 NW2d 98 (1976).

Second, the quotation is taken out of context.  One has only to read the sentence above it to understand the Supreme Court's true meaning.  It quotes a Title VII civil rights case:  "'[W]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.'"  *Hernandez*, *supra* at 359, quoting *United States Postal Service Bd of Governors v Aikens*, 460 US 711, 715; 103 S Ct 1478; 75 L Ed 2d 403 (1983).  The Supreme Court plurality in no place states that, as long as a court rules on *Batson's* third step, the first step can be ignored.  Rather, it observes that a defendant may concede the first *Batson* step by moving the discussion to the second step.  This is a far cry from what the lead opinion claims *Hernandez* stands for.

But even if this section of *Hernandez* were controlling precedent, it would not apply to this case.  Here, defendant did not concede the first *Batson* step.  Instead, counsel's comments were specifically directed at rebutting the claim of a prima facie case.  It was not defendant who moved the process beyond the first step.  It was the trial court that improperly passed over the first *and* second

11

steps of *Batson*.  Given this situation, the *Hernandez* plurality opinion simply does not apply.

## II.  A BATSON ERROR IS STRUCTURAL

The lead opinion concedes that *Batson* errors are subject to automatic reversal, but I find it important to explain why nearly every court that has considered the issue reached the same conclusion.[5]  This includes the United States Supreme Court, because *Batson* itself ordered an automatic reversal.  *Batson*, *supra* at 100.

The Supreme Court gave this reasoning for requiring automatic reversal:  "[W]hen a petit jury has been selected upon improper criteria or has been exposed to prejudicial publicity, we have required reversal of the conviction because the effect of the violation cannot be ascertained." *Vasquez v Hillery*, 474 US 254, 263; 106 S Ct 617; 88 L Ed 2d 598 (1986).  This is in line with the appropriate handling of all structural errors.

The Supreme Court articulated the difference between trial error and structural error in *Arizona v Fulminante*, 499 US 279; 111 S Ct 1246; 113 L Ed 2d 302 (1991).  A trial

---

[5] See *United States v McFerron*, 163 F3d 952, 955-956 (CA 6, 1998), *United States v Hall*, 152 F3d 381, 408 (CA 5, 1998), *Tankleff v Senkowski*, 135 F3d 235, 249-250 (CA 2, 1998), *United States v Underwood*, 122 F3d 389, 392 (CA 7, 1997), and *Ford v Norris*, 67 F3d 162, 170-171 (CA 8, 1995).

error occurs during the presentation of the case to the jury. It can be quantitatively assessed in the context of other evidence for the purpose of determining whether it was harmless beyond a reasonable doubt. *Id*. at 307-308.

A structural error, on the other hand, affects the framework of the trial proceeding. It is more than a mere error in presenting the proofs of guilt. *Id*. at 310. When a structural error occurs, a criminal trial cannot serve as a reliable vehicle for the determination of guilt. No criminal punishment could be fair if structural error existed in the framework of the trial. *Id*.

Although no constitutional guarantee exists with regard to them, *Batson* errors resulting in a denial of the use of peremptory challenges must be structural. They attack the fundamental framework of the trial proceeding. They change the very makeup of the jury. And they do not occur during the presentation of evidence. Given that they do not involve evidence, they cannot be quantitatively assessed in the context of other evidence. This fact is a further indicator that they are not in the nature of trial errors. *Id*.

Structural errors require automatic reversal. *Id*. at 309-310; *People v Cornell*, 466 Mich 335, 363 ns 16-17; 646 NW2d 127 (2002). Therefore, once we conclude that a *Batson*

error existed, we must automatically reverse a conviction. Because this is exactly what the Court of Appeals did, I would affirm its decision.

Automatic reversal leaves no room for error on the part of trial courts. But, as the United States Court of Appeals for the Ninth Circuit stated, referring to *Batson*:

> It is true that trial courts bear a heavy burden in enforcing *Batson*'s anti-discrimination principle, given that the erroneous denial of a party's peremptory challenge has traditionally warranted automatic reversal. However, this concern was alleviated by a recent Supreme Court decision offering guidance to trial courts faced with deciding whether a particular peremptory challenge has a discriminatory motive. [*United States v Annigoni*, 96 F3d 1132, 1142 (CA 9, 1996), citing *Purkett*, *supra* at 767-768.]

The Supreme Court has carefully laid out the procedure required to satisfy *Batson*. We must insist that trial courts adhere to it.

### III. Peremptory Challenges and Automatic reversal

Had no *Batson* errors occurred here and were the errors under scrutiny no more than the wrongful denial of a peremptory challenge,[6] we should nonetheless issue an

---

[6] Of course, I disagree with this assumption because I believe that *Batson* errors occurred. But I also question the assumption for the reason that the judge was considering *Batson* when deciding to deny the challenges. This means that, in denying defendant's challenges, the judge specifically left certain individuals on the jury

Footnotes continued on following page.

14

automatic reversal. The lead opinion's attempt to apply harmless error review is contrary to the decisions of most other courts that have reviewed the issue. Moreover, harmless error review is simply unworkable and cannot logically apply to rulings on peremptory challenges.

The lead opinion departs from the trend set by most other courts that have considered the application of a harmless error analysis to peremptory challenges. It cites *United States v Martinez-Salazar*,[7] to demonstrate that a harmless error analysis is appropriate here. Use of this authority illustrates the dangers in relying on dictum.[8]

It is undeniable that the cited language is dictum given that the Supreme Court concedes that it need not have reached the issue of an appropriate remedy for the claimed error. "Because we find no impairment, we do not decide in this case what the appropriate remedy for a substantial

---

because of their race. If the judge erred in denying the peremptory challenges, he erroneously empanelled jurors because of their race under the belief that defendant was targeting members of the jurors' race. The issue before us does not involve the typical denial of a peremptory challenge. The lead opinion has not made this distinction.

[7] 528 US 304; 120 S Ct 774; 145 L Ed 2d 792 (2000).

[8] There is unavoidable irony in the lead opinion's reliance on this footnote. The footnote's purpose is to criticize the existence of dicta in *Swain v Alabama*, 380 US 202; 85 S Ct 824; 13 L Ed 2d 759 (1965). *Martinez-Salazar, supra* at 317 n 4.

15

impairment would be." *Id*. at 317 n 4. I disagree with the lead opinion's assertion that the dictum of this footnote can constitute "a significant shift" in the law.

The lead opinion's reliance on *Martinez-Salazar* is further misplaced given that the case dealt with an issue distinct from the denial of the use of peremptory challenges. In *Martinez-Salazar*, the trial court erroneously refused to remove a juror for cause. The defendant then used a peremptory challenge to remove the juror. *Id*. at 307. The defendant was not denied the use of his peremptory challenges. In fact, he exercised one so that the objectionable juror did not sit in judgment of him. Therefore, *Martinez-Salazar* did not deal with the denial of a peremptory challenge, and its dictum should not be read as a comment on the issue before us.

The distinction between peremptory denial cases and *Martinez-Salazar* makes a real difference when we consider whether harmless error review applies. In *Martinez-Salazar*, the only existing error was the trial court's error in denying a challenge for cause. It was cured when the defendant used a peremptory challenge to remove the juror. Consequently, the juror took no part in the trial proceedings. The error arose and was cured before the trial began.

16

On the other hand, when a peremptory challenge is denied, the challenged juror stays on the jury and sits in judgment of the defendant.  His or her presence permeates the trial, and the error infects the entire case.[9]

The all-encompassing penetration of the error explains why a harmless error analysis is out of place in the review of the wrongful denial of a peremptory challenge.  To accurately make a harmless error analysis, the court would have to determine the effect that the challenged juror had on the verdict.  In a case directly on point, the United States Court of Appeals for the Ninth Circuit expressed the problem in these words:  "To subject the denial of a peremptory challenge to harmless-error analysis would require appellate courts to do the impossible:  to reconstruct what went on in jury deliberations through nothing more than post-trial hearings and sheer speculation."  *Annigoni*, *supra* at 1145.

Appellate courts have no record of what is said in jury rooms and no record of what potentially subtle influences one juror had on the others.  Therefore, no

---

[9] See *State v Vreen*, 143 Wash 2d 923; 26 P3d 236 (2001), *People v Lefebre*, 5 P3d 295 (Colo, 2000).

device exists with which to plumb the magnitude of the error.

Unlike the typical error subject to harmless error review discussed in *Fulminante*, errors in leaving individuals on a jury cannot be quantitatively assessed in the context of the evidence presented. *Fulminante*, *supra* at 308. Without a means of comparison or measurement, meaningful harmless error analysis is impossible. For this reason, it is illogical to rule as the majority does. It ignores the plight of courts in future cases that attempt to follow its ruling.

Chief Justice Taylor demonstrates in his opinion dissenting in part and concurring in part the difficulty faced in trying to apply the harmless error standard. Although he finds the error harmless, he offers no analysis for his conclusion. Likely, this is because there is no legitimate analysis, beyond mere speculation, that can be applied. In fact, the Chief Justice has demonstrated that the rule now created by the majority is a rule of automatic affirmance. It defies fair appellate scrutiny.

The lead opinion implies that a rule requiring automatic reversal would contradict MCL 769.26.[10] This is inaccurate. Allowing a peremptory challenge error to stand would always amount to a miscarriage of justice. A miscarriage of justice exists if it affirmatively appears that the error undermines the reliability of the verdict. *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999).

Given that an error in denying a peremptory challenge changes the makeup of the jury, it potentially changes the verdict. It alters the jury deliberation and interaction process. The point of a peremptory challenge is to remove someone who appears biased but who might not be removed for cause. Rejecting the peremptory challenge leaves this potentially biased or prejudiced juror on the jury, undermining the validity of the verdict.

---

[10] MCL 769.26 provides:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.

19

Requiring automatic reversal for peremptory challenge errors is consistent with the plain error standard of review articulated by this Court in *People v Carines*, 460 Mich 750; 597 NW2d 130 (1999). *Carines* gave three requirements for plain error: the error (1) must have occurred, (2) must be clear or obvious, and (3) must affect substantial rights. *Id*. at 763. Peremptory challenge errors would always meet this standard.

A peremptory challenge error becomes obvious after the trial court rules on an objection to it. The error is that either a juror who should not be on a jury remains or one who should remain does not.

These errors affect substantial rights because they shape the jury. Peremptory challenges are a means of eliminating extreme beliefs or partiality from a jury. *Batson*, *supra* at 91. The right to a peremptory challenge enables the parties to strike jurors who, although not necessarily excusable for cause, appear biased or hostile in some way. Therefore, the right implicates defendant's right to a fair and impartial trial.

Those plain errors require reversal because they "'"seriously [affect] the fairness, integrity or public reputation of judicial proceedings" . . . .'" *Carines*, *supra* at 763, quoting *United States v Olano*, 507 US 725,

20

736; 113 S Ct 1770; 123 L Ed 2d 508 (1993), quoting *United States v Atkinson*, 297 US 157, 160; 56 S Ct 391; 80 L Ed 555 (1936). Given the fundamental nature of the jury process, having an unfairly chosen jury raises serious questions regarding the integrity and public reputation of the judicial proceedings.[11] Therefore, the errors require automatic reversal. *Id*.

Because we have no tools to gauge the effect of errors in denying peremptory challenges, a harmless error analysis of them is simply unworkable. Therefore, such errors must result in automatic reversal.

IV. PRIMA FACIE CASE OF DISCRIMINATION

The trial court erred in failing to follow *Batson*'s three-step process, and the error is subject to automatic reversal. Hence, the issue whether a prima facie case of discrimination actually existed is technically irrelevant to my dissent. But I feel that it is appropriate to respond to the majority's conclusion that a prima facie case existed.

---

[11] The lead opinion itself concedes that the exclusion of even one juror undermines public confidence in the fairness of the system. *Ante* at 21-22, citing *J E B v Alabama ex rel T B*, 511 US 127, 142 n 13; 114 S Ct 1419; 128 L Ed 2d 89 (1994). Therefore, it has conceded the necessity of automatic reversal.

To reach the majority's conclusion requires not only a strained reading of the existing law regarding *Batson*, but also a strained reading of the factual record in this case. The members of the majority attempt to save the trial judge's ruling by using twenty-twenty hindsight to fit his actions into the *Batson* procedure. Initially, they conclude that, despite the fact that the judge never ruled that prima facie discrimination had occurred, his comments equated to such a ruling.

The trial judge stated that he disallowed the peremptory challenges because defense counsel was using his challenges for the purpose of excluding white males. The record does not support his conclusion. First, at least two of the jurors that defense counsel challenged were female. Second, the race of each challenged juror is not in the record. Therefore, we do not know how many of the challenged male jurors were Caucasian.[12] Third, we know from defense counsel's comments regarding the jurors

---

[12] The lead opinion bases its contention that the race of the excused jurors is determinable on the judge's statement that defense counsel had repeatedly excused Caucasian male jurors. Obviously, this statement is unclear. It is well established that at least two of the challenged jurors were female. Hence, the statement is simply too inexact to determine the race of the challenged jurors, and it is inappropriate for the lead opinion to rely heavily on it.

challenged between Jurors No. 10 and No. 5 that valid reasons existed to challenge some of the Caucasian male jurors. Finally, we can tell from the record that the number of Caucasian males left on the jury was either equal to or exceeded the number of minorities on the jury.

Considering all these facts, a prima facie case of discrimination did not exist. *Batson* requires a court to carefully examine all relevant factors as well as the totality of the circumstances in making its decision. *Batson*, *supra* at 93-94, 96-97. The record indicates that the judge here failed to exercise that careful scrutiny. Instead, he rushed to a conclusion before hearing a thorough discussion and without making an adequate investigation.

It is true that a pattern of strikes against one racial group in jury selection might support an inference of discrimination. *Id*. at 97. But defendant countered this alleged pattern when finally allowed to respond.[13] He indicated that his intervening peremptory challenges fit no

---

[13] The lead opinion contends that the trial judge "almost immediately" allowed defense counsel to respond. *Ante* at 17-18. The record does not support this. Defense counsel and the prosecution had to demand that the judge allow them to make a record. The judge only belatedly and reluctantly allowed defense counsel to speak.

pattern. The fact that a large number of Caucasian males remained on the jury, he argued, demonstrates that he was not targeting such jurors. Our courts have held that a showing that the challenged racial group continued to have a strong representation on the jury is significant evidence that no discriminatory intent existed. *People v Eccles*, 260 Mich App 379, 387-388; 677 NW2d 76 (2004); *People v Williams*, 174 Mich App 132, 137; 435 NW2d 469 (1989).[14]

Given the weak evidence of a pattern and the fact that Caucasian males constituted a significant portion of the jury, the prosecution failed to make a prima facie case of discrimination. Therefore, defense counsel did not need to offer race-neutral reasons for his peremptory challenges. The burden never shifted to him. The trial judge never concluded the first *Batson* step. Hence, he erred in allowing Jurors No. 10 and No. 5 to remain on the jury.

V. THE LEAD OPINION'S DICTUM REGARDING *MILLER*

Part IV of Justice Corrigan's opinion concerns our decision in *Miller, supra,* and the Court of Appeals

---

[14] See also *United States v Sangineto-Miranda*, 859 F2d 1501, 1521-1522 (CA 6, 1988), *United States v Grandison*, 885 F2d 143, 147 (CA 4, 1989), *Commonwealth v Clark*, 551 Pa 258, 280; 710 A2d 31 (1998), and *Valdez v People*, 966 P2d 587, 594 (Colo, 1998).

decision in *People v Schmitz,* 231 Mich App 521; 586 NW2d 766 (1998). As Justice Weaver points out, the entire section is dictum.

In *Miller*, the trial court diluted the defendant's peremptory challenge rights by using the struck jury method.[15] *Miller, supra* at 323. The case before us does not deal with the dilution of a defendant's right to peremptory challenges. It deals with the denial of his peremptory challenges. For this reason, *Miller* is clearly distinguishable from this case.

The lead opinion concedes that its discussion of *Miller* is dictum by stating that "we have concluded that the trial court did not err in denying defense counsel's peremptory challenges." *Ante* at 30. Because it concludes that *Miller* does not apply to its decision, any discussion of *Miller* must be obiter dictum. Part IV lacks the force of an adjudication and is not binding under the principles of stare decisis. *People v Borchard-Ruhland*, 460 Mich 278, 286 n 4; 597 NW2d 1 (1999). Therefore, it is of no value.

---

[15] Under the struck jury method, all members of the jury array are called into the courtroom at once. They are questioned collectively, not individually. After the parties exhaust their preemptory challenges, the judge assembles the jury using the remaining members of the array, starting with the lowest numbers. *Miller, supra* at 323-324.

The issue raised in *Miller* is not before us, and the lead opinion has offered no legal basis to overrule this precedent or to support a conclusion that some former case overruled this precedent.

Oddly enough, the lead opinion claims that I "labor[]" to avoid reference to *Miller* and *Schmitz*. *Ante* at 30 n 22. Nothing can be further from the truth. Even a cursory reading of this section of my dissent indicates that I find *Miller* irrelevant. *Miller* deals with a struck-jury method, which is inapplicable to this case. Nor do I labor to avoid referencing *Schmitz*. I simply found other and more persuasive authority.

Those on the lead opinion state that they may reach *Miller* because I reference it. As stated above, I would not reference either *Miller* or *Schmitz* if the lead opinion had not attempted to overrule them.

Contrary to the lead opinion's statement, nothing in my opinion would prohibit the Court from revisiting *Miller* in the future. If a case actually raising a struck-jury method should come before the Court, the issue in *Miller* could be relevant and the Court could address it. There is nothing novel in my legal conclusion that it is inappropriate to overrule precedent in a case that addresses issues irrelevant to the precedent. But it is

26

inappropriate, as a plurality of the Court does here, to attempt to signal the future demise of the precedent in dictum.

No case has ever explicitly overruled *Miller*. And the lead opinion's attempt today amounts to nothing more than dictum. Therefore, *Miller* should remain valid law.

VI. CONCLUSION

The trial judge erred by failing to follow the *Batson* steps and by shifting the burden to defendant to disprove a presumption of discrimination. He also erred by concluding that a prima facie case of discrimination existed. He did not cure these errors. *Batson* errors and erroneous denials of peremptory challenges are subject to automatic reversal. Therefore, I would affirm the decision of the Court of Appeals, reverse defendant's conviction, and remand the case for retrial.

Also, no legal basis exists to overrule this Court's decision in the *Miller* case. Any comment here on *Miller* is mere dictum without precedential value. I would leave *Miller* unmolested.

Marilyn Kelly

27

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                                            No. 125375

MARLON BELL,

    Defendant-Appellee.
_____

CAVANAGH, J. (*dissenting*).

I dissent from the majority's decision and I agree with the result reached in Justice Kelly's dissent. I would likewise conclude that the trial court erred by collapsing the three steps of *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), into one. See, e.g., *Purkett v Elem*, 514 US 765, 768; 115 S Ct 1769; 131 L Ed 2d 834 (1995). Further, the trial court erred when it failed to allow defendant an opportunity to articulate race-neutral explanations for the challenges. When defense counsel was finally allowed an opportunity to speak, I agree with Justice Kelly and Chief Justice Taylor that defense counsel's comments were directed at *Batson*'s first step. Thus, I would conclude that the trial court's failure to follow *Batson* was error and defendant was

improperly denied the use of his peremptory challenges because the trial court misapplied that decision.

Because the trial court erroneously denied the peremptory challenges on *Batson* grounds, and *Batson* error is subject to automatic reversal and not amenable to harmless error review, I would conclude that defendant is entitled to a new trial.  See, e.g., *United States v McFerron*, 163 F3d 952, 956 (CA 6, 1998) ("[W]e find that harmless error analysis is not applicable to the district court's erroneous application of the three-step *Batson* test and the improper denial of [the defendant's] peremptory challenges.").

Further, I agree with Justices Weaver and Kelly that the majority's dicta regarding *People v Miller*, 411 Mich 321; 307 NW2d 335 (1981), and *People v Schmitz*, 231 Mich App 521; 586 NW2d 766 (1998), is inappropriate given the majority's conclusion that the trial court ultimately did not err.

For these reasons, I must respectfully dissent from the majority's decision.  Accordingly, I would affirm the decision of the Court of Appeals.

Michael F. Cavanagh